# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 25, 2012 Session

## DANIEL B. EISENSTEIN v. WTVF-TV, NEWS CHANNEL 5 NETWORK, LLC ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 11C2538      D.J. Alissandratos, Retired Chancellor

### No. M2011-02208-COA-R3-CV - Filed July 30, 2012

The plaintiff, a public official, sued the defendants for libel and false light invasion of privacy. The defendants filed a motion for summary judgment based on the truth of the statements. The plaintiff sought to complete discovery before the motion was heard. The trial court granted the defendants' motion and plaintiff appealed. We affirm the grant of summary judgment as to the libel claims, but reverse the grant of summary judgment as to some of the false light claims.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Robert L. Delaney, Nashville, Tennessee, for the appellant, Daniel B. Eisenstein.

Ronald George Harris and Jon D. Ross, Nashville, Tennessee, for the appellees, WTVF-TV News Channel 5 Network, LLC, Landmark Media Enterprises, Lyn Plantinga, Sandy Boonstra, and Phil Williams.

### OPINION

#### FACTUAL BACKGROUND

This matter arises from two news stories broadcast by Nashville television station WTVF. The first story, broadcast on July 19, 2010, questioned whether Davidson County General Sessions Judge Daniel Eisenstein was being investigated by the Tennessee Court of

the Judiciary.[1]  The second story, broadcast February 28, 2011, questioned whether Judge Eisenstein hired an unlicensed individual to act as a psychologist for the drug court program. On June 29, 2011, Judge Eisenstein filed a complaint against WTVF-TV, News Channel 5 Network, LLC, Landmark Media Enterprises, LLC, Lyn Plantinga, Station Manager for WTVF, Sandy Boonstra, News Director for WTVF, and Phil Williams, a reporter for WTVF. The complaint alleged that the defendants committed libel and false light invasion of privacy in the two news stories.[2]  The defendants responded to the complaint with a motion to dismiss.

Apparently, the need for a special judge to hear the matter caused some delay, so the defendants moved for a protective order staying discovery until their motion to dismiss was decided.  Chancellor D. J. Alissandratos was appointed to hear the case.  Judge Eisenstein filed an affidavit pursuant to Tenn. R. Civ. P. 56.07 requesting to complete discovery before the defendants' motion to dismiss was heard.  The trial court heard all the pending motions on September 22, 2012.  Because materials outside of the pleadings were submitted in support of the motion to dismiss, the court treated the motion as one for summary judgment.[3] The trial court granted the motion for summary judgment in an order entered October 3, 2012, stating that "because [Judge Eisenstein] is a public figure, the Court must, under existing case law, grant the defendants a judgment."  Judge Eisenstein has appealed to this court.

LEGAL BACKGROUND

Libel

Libel is a form of defamation.  *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994).  Ordinarily, a libel action involves a written defamation.  *Id.*  Broadcasts, however, "should be considered libel; particularly if they are based on written scripts."  *Ali v. Moore*, 984 S.W.2d 224, 227 (Tenn. Ct. App. 1998).[4]

---

[1]The Tennessee Court of the Judiciary investigates and addresses complaints of judicial misconduct. It will be replaced July 1, 2012, by the Board of Judicial Conduct created by Chapter 819 of the Tennessee Public Acts of 2012.

[2]The specifics of these stories and Judge Eisenstein's allegations will be addressed later in this opinion.

[3]Consequently, we will refer to the motion as one for summary judgment.

[4]The theory behind the rule is that a broadcast's wide dissemination puts "the broadcaster upon the
(continued...)

Neither party suggests that this case should be treated otherwise than as a libel action. To establish a *prima facie* case of defamation, the plaintiff must prove the following elements:

> (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. If the plaintiff in a case of libel is a public official or public figure, they must also prove that the libelous statements were made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The public figure must demonstrate evidence of actual malice with "convincing clarity." However, the basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person.

*Hibdon v. Grabowski,* 195 S.W.3d at 48, 58 (Tenn. Ct. App. 2005) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964)(other citations omitted)).

False Light Invasion of Privacy

The Tennessee Supreme Court has adopted the definition of false light invasion of privacy found in Section 652E of the Restatement (Second) of Torts:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
>> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>>
>> (B) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

RESTATEMENT (SECOND) OF TORTS *§ 652E (1977); see West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640, 643-44 (Tenn. 2001). *See also Flatt v. Tenn. Secondary Sch. Athletic Ass'n,* M2001-01817-COA-R3-CV, 2003 WL 61251, at *2 (Tenn. Ct. App. Jan. 9, 2003).

---

[4](...continued)
same footing as the publisher of a newspaper." RESTATEMENT (SECOND) OF TORTS § 568A cmt.a (1977).

When the plaintiff is a public official or public figure, the appropriate standard for false light claims is actual malice. *West,* 53 S.W.3d at 647.

The defendants maintain that everything they said in the broadcast was true. Literal truth is not, however, a defense in a false light claim:

> The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. "'Literal accuracy of separate statements will not render a communication "true" where the implication of the communication as a whole was false.' . . . The question is whether [the defendant] made 'discrete presentations of information in a fashion which rendered the publication *susceptible to inferences* casting [the plaintiff] in a false light.'" *Santillo v. Reedel*, 430 Pa. Super. 290, 634 A.2d 264, 267 (1993)(citing *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181 (1988)(emphasis added).

*Id.* at 645 n.5. Thus, the falsehood involved in a false light action "may consist in dissemination of matters which, while technically true, give an objectionably false impression where the communicator fails to modify the basic statement with amplifying facts which modify the statement to create a less objectionable impression corresponding to full reality." Russell G. Donaldson, Annotation, *False Light Invasion of Privacy – Cognizability and Elements*, 57 A.L.R.4TH 22, § 13 (Cum. Supp. 2012).[5]

---

[5]While *West* is the Tennessee case in which false light invasion of privacy was first recognized, some commentators cite *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978), as an example of the false light invasion of privacy tort in Tennessee. *See* Russell G. Donaldson, Annotation, *False Light Invasion of Privacy – Cognizability and Elements*, 57 A.L.R.4TH 22, § 13 (Cum. Supp. 2012); 62A AM. JUR. 2D *Privacy* § 132 (2012). The facts of *Nichols* have been succinctly stated as follows:

> [The Tennessee Supreme Court] held liable a newspaper that truthfully reported that a woman, upon finding her husband at plaintiff's home, shot the plaintiff. In that case, the article neglected to mention that the plaintiff was hosting a social gathering at the time, thereby implying that the plaintiff and the suspect's husband were having an affair.

*Toney v. WCCO Televison, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996). The *Toney* opinion labels *Nichols* "[p]erhaps the quintessential modern case of defamation by implication." *Id. See also* Christopher P. Guzelian, *True and False Speech*, 51 B.C. L. REV. 669, 688 (2010); Elizabeth Blanks Hindman, *When is the Truth not the Truth? Truth Telling and Libel by Implication*, 12 COMM. L. & POLICY 341, 354 (2007). The Tennessee Supreme Court in *West* refers to *Nichols* as involving "defamation claims," *West*, 53 S.W.3d at 648, and this court has observed that "Tennessee law recognized the doctrine of

(continued...)

STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.,* 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall,* 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Blair,* 130 S.W.3d at 763. Accordingly, we must review the record de novo and make a fresh determination of whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn. 1993).

The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Byrd,* 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Id.* To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must either: "(1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan,* 270 S.W.3d at 8-9.[6] It is not enough for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." *Id.* at 10. "Similarly, the presentation of evidence that raises doubts about the nonmoving party's

---

[5](...continued)
defamation by innuendo or implication in [*Nichols*]." *Isbell v. Travis Elec. Co.*, M1999-00052-COA-R3-CV, 2000 WL 1817252, at *6 (Tenn. Ct. App. Dec. 13, 2000). Still, it has been observed that there is "significant and substantial overlap between false light and defamation." *Jews For Jesus, Inc., v. Rapp*, 997 So.2d 1098, 1113 (Fla. 2008). *See also* Patricia Avidan, *Protecting the Media's First Amendment Rights in Florida: Making False Light Plaintiffs Play by Defamation Rules*, 35 STETSON L. REV. 227, 238 (2005) ("Many commentators and courts cite the fact that plaintiffs may allege false light based on true statements as a major distinguishing factor between defamation and false light. This distinction blurs, however, in jurisdictions such as Florida, where courts recognize defamation by implication.") The main distinction appears to be in the injury to be addressed. "[I]n defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to [the] inner person." *West*, 53 S.W.3d at 645-46. Judge Eisenstein did not plead a cause of action for defamation by implication, thereby placing all of his eggs in the basket of false light.

[6]Tennessee Code Annotated § 20-16-101 (2011), which is intended to replace the summary judgment standard adopted in *Hannan*, is inapplicable to this case. *See Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18, 25 n.2 (Tenn. 2011) (noting that section 20–16–101 is only applicable to actions filed on or after July 1, 2011).

ability to prove his or her claim is also insufficient." *Martin,* 271 S .W.3d at 84. If the moving party fails to satisfy its initial burden of production, the court should dismiss the motion for summary judgment. *Hannan,* 270 S.W.3d at 5. We consider the evidence presented in support of and in opposition to a motion for summary judgment in the light most favorable to the nonmoving party, resolve all inferences in that party's favor, and discard all countervailing evidence. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002); *Byrd,* 847 S.W.2d at 210-11. The "grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion." *Sykes,* 343 S.W.3d at 26 (quoting *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)).

ANALYSIS

The Need for Further Discovery

Judge Eisenstein wanted to continue the defendants' motion for summary judgment and conduct further discovery. He maintained that he needed more discovery to adequately respond to the defendants' motion for summary judgment. The trial court stayed further discovery until the motion for summary judgment was decided. On appeal, Judge Eisenstein argues that the trial court erred in denying his request that the motion for summary judgment be continued. We review the trial court's refusal to grant the continuance for an abuse of discretion. *Regions Fin. Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 401 (Tenn. Ct. App. 2009).

The defendants' motion for summary judgment is based on the truth of the statements made in the broadcasts. Judge Eisenstein's affidavit provides detailed reasons why the defendants' statements, in his view, were false or misleading. He indicates that he seeks further discovery to do such things as "inquire about the Defendants' efforts to institute an investigation of me prior to their July 19, 2010 broadcast of a news story in which it was asserted such an investigation was occurring or a legitimate question existed about this matter," "demonstrate that the Defendants knew or had obvious reasons to doubt the truth of what was broadcast on February 28, 2011," "demonstrate the Defendants knew or had obvious reasons to know or [sic] their reliance on a participant in the Mental Health Court program was misplace[d]," and develop proof that Williams "contrived the July 19, 2010 news story as a means to injure my reputation and as retribution for what he wrongly concluded was an effort by me to embarrass him" when Judge Eisenstein conducted an inquiry into the police department's handling of Williams's parking tickets. As the defendants point out, these matters for which further discovery was sought are relevant to the "actual malice" requirement for libel and false light invasion of privacy, not to the truth of

-6-

the statements in the broadcasts. Therefore, we find that the trial court did not abuse its discretion in staying further discovery until the resolution of the defendants' motion.

The Trial Court's Decision on Motion for Summary Judgment

The trial court ruled that Judge Eisenstein must lose because he is a public figure. Even the defendants, who won the motion, do not defend the trial court's reasoning. A plaintiff who is a public figure, as Judge Eisenstein is, can win a defamation action, but to do so the plaintiff must prove that the defamatory statements were made with actual malice. *Hibdon*, 195 S.W.3d at, 58 (Tenn. Ct. App. 2005). "The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 302 n.31 (Tenn. Ct. App. 2007). As previously noted, in an appeal from the grant of summary judgment, we must review the record de novo and make a fresh determination of whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. We now proceed with that analysis, discussing the two broadcasts separately.

**The First Broadcast**

Libel

The defendants' motion to dismiss (which was treated as a motion for summary judgment) focused on showing that neither broadcast contained any false and defamatory statements. Such a showing would negate an element of the libel action.

The first broadcast begins with the question, "Is the presiding judge of Davidson County's general sessions court facing an ethics investigation?" Questions can be libelous under certain circumstances. *McCluen v. Roane Cnty Times, Inc.*, 936 S.W.2d 936, 940. (Tenn. Ct. App. 1996). To be considered defamatory, "a question must be reasonably read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation." *Secured Fin. Solutions, LLC v. Winer*, M2009-00885-COA-R3-CV, 2010 WL 334644, at *3 (Tenn. Ct. App. Jan. 28, 2010)(quoting 50 AM. JUR.2d *Libel and Slander* §154 (2006) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)). Immediately following the question, the broadcast's anchor says, "Judge Dan Eisenstein's lawyer insists that he's not." A second anchor then states, "But a recent court filing tells a different story with an attorney for the court that regulates Tennessee judges hinting that there may indeed be an investigation."

Reporter Phil Williams then explains that, in a deposition filed in a Court of the Judiciary matter involving Judge Gloria Dumas, investigator James LaRue expressed concern that his work could lead to efforts to "ostracize" his daughter's law practice in the general sessions court. Williams relates that, when asked in the deposition why he had this concern, LaRue explained that, "My statement is based on my conversations with Judge Eisenstein." Then, the lawyer for the Court of the Judiciary said, "We're going to object to that," citing "Rule 8 confidentiality, matters under investigation. Judge Eisenstein has got an attorney." The broadcast then notes that Judge Eisenstein's lawyer, David Raybin, "denied there are any matters under investigation," and then ran a quote from Raybin. Later in the broadcast, the second anchor asks Williams about what the Court of the Judiciary had to say about the existence of an investigation. He replies that the attorney for the court would not comment. Williams then reiterated that Judge Eisenstein's lawyer "said that under the court's procedures the judge is usually given a chance to respond to any allegations that may be under investigation. That hasn't happened, Raybin said, so by his way of thinking there should not be an investigation."

The defendants' motion was supported by affidavits from Sandy Boonstra with exhibits, Phil Williams with exhibits, and Leigh Kahan with an exhibit. Of particular relevance is the deposition of James LaRue, an exhibit attached to Williams's affidavit. A review of the deposition shows that the statements attributed to the deposition were accurate. In our opinion, the defendants affirmatively negated an essential element of the plaintiff's libel claim, namely that the statements were false. Thus, the burden of production then shifted to the plaintiff to show that a genuine issue of material fact exists.

Judge Eisenstein argues that the defendants "asserted" that he was under investigation by the Court of the Judiciary. He maintains that a fair reading of the broadcast shows that the defendants answered their question "Is the presiding judge of Davidson County's general sessions court facing an ethics investigation?" in the affirmative. He also submits that no reasonable person can read the LaRue deposition and "fairly conclude he was being investigated by the Court of the Judiciary or legitimately suggest there was a fair question about it." We respectfully disagree. We find no "assertion" by the defendants that there was an investigation. The question raised was just that – a question. It is "not equivalent to a direct charge." *McCluen*, 936 S.W.2d at 940. Rather, it invites an answer of "yes," "no'" or "I don't know." *Id*. The comments of the attorney for the Court of the Judiciary found in LaRue's deposition do raise a fair question about whether Judge Eisenstein was being investigated.[7] Three separate times the broadcast mentioned that Judge Eisenstein's lawyer

_____

[7]At another point in the deposition, the attorney was trying to explain what had happened: "he [LaRue] mentioned another name [Judge Eisenstein] at which point I broke in and interjected that that was

(continued...)

said that there was no investigation. The question of "is there an investigation" is not answered. We find no genuine dispute of material fact as to the truth of the statements made in the first broadcast. Judge Eisenstein did not meet his obligation to show that a genuine issue of material fact exists. Therefore, summary judgment on the libel issue as to the first broadcast is appropriate.

### False Light Invasion of Privacy

We have previously determined that the facts stated in the July 19, 2010 broadcast are substantially true. The question becomes, under the false light analysis outlined above, whether the defendants' broadcast made any discrete or selective presentations of information that are susceptible to inferences which cast Judge Eisenstein in a false light. Judge Eisenstein says that the premise of the broadcast was that he was being investigated by the Tennessee Court of the Judiciary. We do not believe that any reasonable person would view the broadcast that way. As previously stated, we find no "assertion" that there was an investigation. The question raised was just that – a question. Furthermore, the comments of the attorney for the Court of the Judiciary found in LaRue's deposition do raise a fair question about whether Judge Eisenstein was being investigated.

Judge Eisenstein also maintains that the broadcast implies that he attempted to obstruct LaRue's investigation of Judge Dumas and that this conduct is the subject of an investigation by the Court of the Judiciary. This complaint arises from the following statements by reporter Phil Williams:

> Another subject of concern, Eisenstein's reaction when the investigator [LaRue] went to ask about personnel records for Dumas's daughter. He testified, "The personnel officer proceeded to inform me that she would not even tell me what day it was, nor the time of day, nor would she answer any question that I had." Why did she do that? "By order of Judge Eisenstein." . . . But Eisenstein's lawyer insists the judge was just trying to ensure that confidential records were not released without a subpoena.

Judge Eisenstein insists there is more to it than the broadcast indicates and that the broadcast, therefore, casts him as an obstructionist. Paragraphs 25 through 27 of Judge Eisenstein's affidavit explain what the broadcast omitted:

---

[7](...continued)
*another matter under investigation*, and we felt that there was the whole Rule 8 Court of the Judiciary problem." (Emphasis added).

25. In conducting the Tennessee Court of Judiciary's investigation of Judge Dumas, Mr. LaRue just "showed up" at the A. A. Birch Building in late January, 2010 and early February, 2010. He gave no notice, had no subpoenas or order of court. Without contacting me as Presiding Judge, Warner Hassell, Administrator of the General Sessions Court or the Metropolitan Legal Department, Mr. LaRue was on his own going to various offices involved in the administration of the Davidson County General Sessions Courts demanding information and attempting to interview witnesses.

26. The court personnel in the A. A. Birch Building were very upset by Mr. LaRue's activities and it was having a very disruptive effect on the administration of the Courts. The General Sessions Judges discussed all this at our monthly meeting held at noon on February 3, 2010. The policy adopted at this meeting reads as follows: "[n]o employee is allowed to comment or release any employee related personnel or payroll records to anyone without receiving prior approval from either the Presiding Judge or the employee whose records are being requested." The minutes of that meeting are attached to this Affidavit and fully incorporated by reference as Exhibit 4.

27. A majority of the General Sessions Judges again met on February 5, 2010 to discuss the Court of Judiciary's activities. The minutes of that meeting are attached to this Affidavit and fully incorporated by reference as Exhibit 5. A portion of these minutes read as follows:

> Issues discussed in the meeting included, but [not] limited to, the rules of civil procedures not being followed by the Court of the Judiciary counsel and all parties in a pending lawsuit in a complaint were not notified when information that was part of a pending lawsuit was being requested from the Court Administration Office. David Raybin mentioned that, based upon his conversation with Judge Daniel, Judge Daniel would be following the rules of civil procedure.
>
> The judges in consultation with Metro Legal reaffirmed the following:
>
> No employee is allowed to comment or release any employee related personnel or payroll records to anyone without receiving prior approval from either the Presiding Judge or the employee whose records are being requested.

The Metropolitan Government's Director of Law, Ms. Sue Cain, wrote a letter dated February 18, 2010 to Mr. Steve Daniel, former Disciplinary Counsel for the Tennessee Court of Judiciary about these matters, which is attached to this Affidavit as Exhibit 6 and fully incorporated by reference.

Thus, Judge Eisenstein maintains that he was not being an obstructionist but rather carrying out the policy of the General Sessions Court regarding employee records.

The defendants had the burden, in the summary judgment context, of (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan,* 270 S.W.3d at 8-9. Their motion was based solely on the truth of the facts broadcast. As previously discussed, truth is not a defense in a false light claim. However, as to the false light claim by Judge Eisenstein that the premise of the broadcast was that he was being investigated by the Tennessee Court of the Judiciary, we do not believe that any reasonable person would view the broadcast that way, so the grant of summary judgment as to that claim is affirmed.

As to the claim that the broadcast portrayed Judge Eisenstein as an obstructionist, we find that the broadcast is susceptible to such an inference by a reasonable person. Our analysis cannot stop here, however, because the defendants maintain that the broadcast and its inferences are protected by the fair report privilege. The fair report privilege is a qualified privilege. *Lewis,* 238 S.W.3d at 284; *Langford v. Vanderbilt Univ*., 318 S.W.2d 568, 574 (Tenn. Ct. App. 1958). It applies to "public proceedings or official actions of government that have been made public." *Lewis*, 238 S.W.3d at 285. To qualify for the privilege, "the report must be 'a fair and accurate summation of the proceeding,' and must display balance and neutrality." *Id*. at 284 (quoting *Smith v. Reed*, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996)).[8] The report "will not be shielded by the privilege if it contains any false statement of fact regarding what occurred during the proceeding, any garbled or one-sided account of the proceeding, or any defamatory observations or comments." *Lewis,* 238 S.W.3d at 284. The broadcast was a fair and accurate summation of the LaRue deposition and contained a statement that "Eisenstein's lawyer insists the judge was just trying to ensure that confidential records were not released without a subpoena." This explanatory attempt at balance by the reporter is somewhat consistent with Judge Eisenstein's claim that he was just

---

[8]It appears that at one time the fair report privilege required an absence of malice. In *Saunders v. Baxter*, 53 Tenn. 369, 381 (1871), the Tennessee Supreme Court stated that, "[A] *bona fide* report of the proceedings in a court of justice, in the absence of express malice, is not libel, though the publication may be injurious to the character of an individual." Although this requirement seems to exist in some other states, *see Freedom Commc'ns, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602 at *5 (Tx. Ct. App. June 15, 2006), subsequent Tennessee cases do not require it.

following the General Sessions Court policy. To qualify for the fair report privilege, a report does not have to be "technically accurate in every detail, as long as it conveys a correct and just impression of what took place." *Id*. Although it is a close question, we believe the privilege applies and that, therefore, the grant of summary judgment on this claim is also appropriate.

**The Second Broadcast**

The second broadcast is more complicated than the first. Therefore, we are including a transcript of that broadcast, as follows[9]:

> ANCHOR 1: Tonight, a News Channel 5 investigation has uncovered serious questions about whether a Nashville judge put mentally ill defendants in the care of a man who wasn't licensed to treat them.
>
> ANCHOR 2: The judge and the man that he called an excellent psychologist insists [sic] they haven't done anything wrong. But as our chief investigative reporter, Phil Williams discovered, their answers raise even more questions.
>
> REPORTER: General Sessions Judge Dan Eisenstein runs the Davidson County Mental Health Court, a court designed to give troubled offenders a chance to get the help they really need.
>
> JESSICA POE: He's literally said, "I am God in this courtroom. You know, you're going to do what I say you're going to do."
>
> REPORTER: For Jessica Poe, that meant being ordered to take psychiatric medications and working with this man. Poe says James Casey was her psychologist.

---

[9]This transcript is based on a transcript of the February 28, 2011 broadcast attached as an exhibit to the affidavit of Sandy Boonstra. Minor changes in words and punctuation have been made from listening to the DVD of the broadcast and examining the copy of the news story as posted on the NewsChannel 5 website, both of which were also attached as exhibits to the Boonstra affidavit.

JESSICA POE: He was all about talking, talk therapy, you know, getting into the root of your issues and like why you were behaving or acting out the way you were.

REPORTER: Dr. Casey, I'm Phil Williams . . . But as our News Channel 5 investigation discovered, Casey may have his own issue.

REPORTER: You're not licensed, are you?

JAMES CASEY: No, sir.

REPORTER: Under Tennessee law, it's illegal for a person to present themselves or let others present them as a psychologist unless that person is indeed licensed by the state as a psychologist. It's also illegal for them to provide counseling, psychoanalysis or psychotherapy.

DR. THOMAS: And if they're not licensed, then they're not accountable.

REPORTER: Dr. Murphy Thomas is a past president of the Tennessee Psychological Association. He says a psychologist license shows that the person has what it takes before he starts tinkering with peoples' lives.

DR. THOMAS: I've seen people who have been treated in very destructive ways. There was nothing that could be done because they were not licensed and they wouldn't qualify, and what do you do?

REPORTER: Hey, Judge, Phil Williams. I'd like to talk to you about James Casey.

JUDGE EISENSTEIN: I can't discuss that with you right now.

REPORTER: Through an attorney, Judge Eisenstein claimed he never hired Casey to do the work of a psychologist.

JUDGE EISENSTEIN: See all these TV cameras here, I want you to say that one more time.

REPORTER: Yet the judge was all smiles at this ceremony last fall as Poe listed the benefits of Mental Health Court.

JESSICA POE: One is the relationship I was able to form with a psychologist for the first time in my life, Dr. Casey.

REPORTER: Afterwards, the man she called her psychologist could be seen congratulating her on a job well done.

JAMES CASEY: I don't do any psychiatric care in the Mental Health Court.

REPORTER: Why would that young lady have said you were her psychologist? Was she making it up?

JAMES CASEY: Ah, I don't know, you're going to have to refer - - I don't know.

REPORTER: In fact, Casey's own resume shows that in April of 2008 he first began working as a quote "independent contracted clinician" for the court. Among his duties: "facilitate weekly group therapy."

REPORTER: (To Dr. Thomas): Group therapy is one of the things–

DR. THOMAS: Yes.

REPORTER: –you cannot do unless you're a licensed psychologist?

DR. THOMAS: That's correct.

-14-

REPORTER:  Documents show that in late '08 Judge Eisenstein wanted to put Casey on staff using federal money, writing in this memo that Casey had proven himself an excellent psychologist.

REPORTER:  You told the Department of Justice that he was an excellent psychologist; what gave you that idea?

JUDGE EISENSTEIN:  (Did not answer.)

REPORTER:  Eisenstein's lawyer says the judge later learned that Casey was not licensed, but felt he could still be useful in other roles.  But more than a year later this tax return, sworn to by the judge himself, listed Casey as "staff psychologist."

REPORTER:  If you knew he wasn't licensed, why would you tell the IRS that he was your staff psychologist?

Still, the judge had nothing to say.

REPORTER:  How can you be treating patients and not be licensed?

JAMES CASEY:  I'm working under supervision.

REPORTER:  The judge's attorney says Casey did engage in what he called clinical activities under the supervision of a clinical psychiatrist.  A letter from the psychiatrist says he met with Casey just one hour weekly.

DR. THOMAS:  If that individual is saying, well, because I've been supervised by a psychiatrist, I can practice psychology, that's not the case.

JAMES CASEY:  I never claimed to be, you know, that I was licensed.

REPORTER:  But Casey did bill a sister program operated by the Davidson County Drug Court known as DC4,

for "clinical services" and for a while had checks made out to Casey's Psychological Services.

JESSICA POE: Thank you, Dr. Casey. You are the backbone of this court, as far as I'm concerned.

REPORTER: While Jessica Poe says that it does not matter to her whether Casey is licensed, or not–

JESSICA POE: Dr. Casey is great at what he does. I don't care if he's not licensed with the state.

REPORTER: - - experts say it should matter to Judge Eisenstein, especially when he's putting mentally ill defendants into that person's hands.

Now, our investigation discovered that when Casey first began providing counseling service, he was being represented as Dr. Casey, even though he had not yet been awarded a doctorate. He later got that degree. Still, the state requires tests, background checks and all sorts of other hoops before someone can work as a psychologist.

And, Rory, the Davidson County Drug Court which now pays him refuses to say if he's still doing therapy for its clients.

ANCHOR 2: And, Phil, he claims that he was working under supervision; does that make any difference?

REPORTER: Not really. He also claimed to be working under the supervision of a psychologist over at Meharry, but the state says he would still need a license and he just doesn't have one.

ANCHOR 2: Interesting. Phil, thanks so much for that.

The judge and Dr. Casey have sent us multiple letters insisting they've done nothing wrong, and you can see those and all our documents at Newschannel5.com. Then tell us what you think. Go to the News Channel 5 Investigates page on Facebook.

(End of Recording)

Libel

As with the first broadcast, the defendants argued in their motion for summary judgment that the statements in their report were true. The defendants' motion was supported by affidavits from Sandy Boonstra with exhibits, Phil Williams with exhibits, and Leigh Kahan with an exhibit. It appears from these materials that the statements made in the broadcast are true. Thus, the defendants affirmatively negated an essential element of the plaintiff's libel claim. Consequently, the burden of production shifted to the plaintiff to show that a genuine issue of material fact exists.

Judge Eisenstein provided his own affidavit to show that genuine issues of material fact still exist. He maintains that several statements in the broadcast were false. First, he denies that he entered into an agreement that allowed the use of an unlicensed psychologist, James Casey, to treat mentally ill persons in the Davidson County Mental Health Court. In the broadcast, Casey admitted that he was not licensed. The report went on to state that "Judge Eisenstein claimed he never hired Casey to do the work of a psychologist." This is consistent with Judge Eisenstein's affidavit.[10] However, the broadcast continued on to explore what Casey actually did.

The reporter interviewed a participant in the mental health program who stated: "He was all about talking, talk therapy, you know, getting into the root of your issues and like why you were behaving or acting out the way you were." She referred to him as a psychologist and called him "the backbone of this court" in a ceremony. In the broadcast, the reporter quotes from Casey's resume that he worked as an "'independent contracted clinician' for the court. Among his duties: 'facilitate weekly group therapy.'" The broadcast utilized a past president of the Tennessee Psychological Association saying that group therapy is one of the things a person must be licenced to do. Even Casey seems to admit in the broadcast that he performed such services by saying that he worked "under supervision." Judge Eisenstein's attorney also told the reporter that Casey engaged in "clinical activities"

_____

[10]Paragraph 62 of Judge Eisenstein's affidavit states that the judge "never intended for him to perform the duties of a licensed psychologist."

-17-

under the supervision of a clinical psychiatrist, who provided a letter saying he met with Casey one hour a week. The past president of the Tennessee Psychological Association said in the broadcast that such supervision does not allow an unlicensed person to practice psychology.

Judge Eisenstein's affidavit points to Casey's Independent Contractor Agreement which says he "shall implement the joint programs of the Davidson County Mental Health Court and the Davidson County Drug Court (DC4). Dr. Casey is to work in conjunction with personnel of DC4 and the Drug Court Foundation." The judge says that nothing in this language states or implies that Casey will act as a licensed psychologist. Yet, we note that the language does not indicate the duties with any degree of specificity, either.

As to his first claim of libel, that he entered into an agreement to use an unlicensed psychologist to treat mentally ill persons in the Davidson County Mental Health Court, Judge Eisenstein has not carried his burden to provide evidence that these statements may not be true, that genuine issues of material fact exist. Consequently, as to this claim, the grant of summary judgment was appropriate.

Judge Eisenstein's second claim of falsity is that he did not mislead the United States Department of Justice about Jim Casey's licensure credentials in order to obtain an improper or unlawful allocation of congressionally appropriated funds. On this topic, the reporter stated that, "Documents show that in late '08 Judge Eisenstein wanted to put Casey on staff using federal money, writing in this memo that Casey had proven himself an excellent psychologist." The reporter also said, " Eisenstein's lawyer says the judge later learned that Casey was not licensed, but felt he could still be useful in other roles."

The affidavit of Judge Eisenstein admits the submission to the Bureau of Justice seeking funds for the payment of Casey. The affidavit admits that Judge Eisenstein made an error. It also states that when he discovered the error, he did not ask for disbursement of the funds. Furthermore, such submissions, to the best of the judge's knowledge, cannot be corrected once submitted. Attached to the affidavit are letters dated January 28, 2011, and February 2, 2011, sent from the judge's attorney to the defendants' attorney, which provide these facts to the defendants well before the broadcast of February 28, 2011.

The statements made in the broadcast were true. Judge Eisenstein pled libel, not defamation by implication.[11] Therefore, as to this claim, the grant of summary judgment was appropriate.

---

[11]See footnote 5, *infra*.

Next, Judge Eisenstein maintains that he did not refuse to provide the defendants with information about his role in these matters. The broadcast shows reporter Phil Williams approaching Judge Eisenstein on the street and stating, "Hey, Judge, Phil Williams. I'd like to talk to you about James Casey." Judge Eisenstein's reply was, "I can't discuss that with you right now." Later the broadcast returned to the sidewalk encounter. Williams asked the judge two other questions and Judge Eisenstein was shown not replying. After the second question, Williams observed, "Still, the judge had nothing to say."

Judge Eisenstein's affidavit addresses the broadcast's "had nothing to say" statement:

I believe a fair analysis of the letters and other information sent to the Defendants reveals that I had a lot to say about the subject matter of what ultimately became the February 28, 2011 news story. I was providing this information to the Defendants in an agreed format . . .

My counsel informed the Defendants' counsel that I was not agreeable to an on camera interview with the Defendant, Williams because I am mistrustful about the manner in which he edits or presents such interviews. Despite our efforts to fully cooperate in providing information about the subject matter of the February 28, 2011 news story and the agreement with his counsel, the Defendant, Williams apparently followed me to my lawyer's office with a camera person on February 21, 2011 (i.e. President's Day).

Following my meeting with my lawyer, I was returning to my car at the A.A. Birch Building. As I walked to the intersection of Deaderick Street and Third Avenue in Nashville, Tennessee, Mr. Williams and his camera person appeared around the corner of the Regions Center asking questions and making video.

I told the Defendant, Williams I could not talk with him. I was providing information on the proposed news story about the Mental Health Court in an agreed fashion through counsel. Despite my statement to him, he continued to ask questions and his camera person continued to video me until I returned to the interior of Regions Center. The representation I had nothing to say about the February 28, 2011 news story is totally false. The Defendant, Williams, contrived a circumstance to make it appear otherwise to unknowing members of the Defendants' viewing audience and to harm my reputation or cast me in a false light.

The defendants reply that "It is true that Judge Eisenstein had nothing to say when the Defendant reporter asked those questions at that specific time (which is all the comment in the news story related to)." They go on to argue that "[t]he news story does not broadly state, as Appellant argues, that the Judge had nothing whatsoever to say at any point about the entire subject matter of the February 28, 2011 story or was unwilling to provide any information." They also claim that "[t]he news story actually contains repeated references to what Judge Eisenstein said about the subject of the news story."

The "had nothing to say" comment by reporter Williams immediately follows Judge Eisenstein's refusal to speak to Williams on the sidewalk. The comment is literally true. Thus, under the law of libel, the grant of summary judgment was appropriate.

## False Light

Since the statements in the February 28, 2011 broadcast about which Judge Eisenstein complains are true, the question becomes, under the false light analysis outlined above, whether the defendants' broadcast made any discrete or selective presentations of information that are susceptible to inferences which cast Judge Eisenstein in a false light. We do not find any such selective presentations regarding the issue of hiring an unlicensed person to treat patients. As for Judge Eisenstein's second issue, we believe that a reasonable person could find that, by leaving out the fact that Judge Eisenstein did not pursue the grant once he found that Casey was not licensed, the portion of the broadcast concerning submission of the funding request to the Department of Justice could be viewed as holding Judge Eisenstein in a false light by implying he lied to the Department of Justice. Similarly, a reasonable person could find that the portion of the broadcast stating that Judge Eisenstein "Still, . . . had nothing to say," while showing him refusing to discuss the matter with Williams on the sidewalk, held Judge Eisenstein in a false light by indicating he was uncooperative or evasive, even though the broadcast also mentioned information supplied by his lawyer. Therefore, as to these latter two claims, we reverse the grant of summary judgment.

## CONCLUSION

This case is affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion. Costs of appeal are assessed against the appellees, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE