IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2019 Session

**THOMAS J. ELSTEN, JR. V. JEFFREY COKER ET AL.**

**Appeal from the Circuit Court for Sumner County**
**No. 2017-CV-446     Joe H. Thompson, Judge**

———————————————

**No. M2019-00034-COA-R3-CV**

———————————————

This appeal arises from a defamation action filed by one mayoral candidate against another for statements made during the City of Hendersonville, Tennessee mayoral race. Accordingly, the issues are to be judged based on the more stringent standards that apply in a defamation action brought by a public figure. After engaging in discovery, the defendant filed a motion for summary judgment, contending the plaintiff lacked evidence showing the defendant published the statements with actual malice. To withstand the motion for summary judgment, the plaintiff had the burden to demonstrate he would be able to prove clearly and convincingly that the defendant acted with actual malice, which required proof the defendant had knowledge that the facts he published about the plaintiff were false or that he acted with reckless disregard as to their truth or falsity. The trial court found that the plaintiff "did not produce clear and convincing evidence of actual malice at the summary judgment stage" and summarily dismissed the action. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Kirk L. Clements, Nashville, Tennessee, for the appellant, Thomas J. Elsten, Jr.

John J. Griffin, Jr. and Michael A. Johnson, Nashville, Tennessee, for the appellee, Jeffrey Coker and Jeff Coker for Mayor.

**OPINION**

Thomas J. Elsten, Jr. ("Elsten") and Jeffrey Coker ("Coker") ran for mayor of Hendersonville in 2016. Just prior to the November election, Coker and the Jeff Coker for Mayor campaign organization published and disseminated a pamphlet to Hendersonville residents titled: "Are You Tired of the 'Revolving Door' of Career Politicians and

Special Interests?" Next to Elsten's picture and name, the pamphlet stated, *inter alia*, "An [sic] an alderman, he was caught in an insider deal to sell stolen property to the Hendersonville Parks Department and is currently under investigation by the Tennessee Ethics Commission for campaign finance violations relating to illegal contributions from a construction company owner."[1] (Hereinafter, these two statements are referred to as the "insider deal" and the "ethics investigation," respectively.)

In May 2017, Elsten filed a complaint against Coker and his campaign organization[2] for defamation, defamation per se, and defamation by implication/false light[3], alleging they published false, defamatory statements about Elsten and either knew the statements were false or made a conscious decision not to investigate their truth. Coker and his campaign organization answered the complaint, denying the allegations.

After the parties engaged in discovery, Coker and his campaign organization filed a joint motion for summary judgment primarily contending that Elsten's defamation claim failed as a matter of law because Elsten admitted the truth of both statements. As for the insider deal, Elsten conceded that in July 2009, when he was an alderman for the City of Hendersonville, he purchased an all-terrain vehicle known as a "Gator" from a friend for $1,650. He then sold the Gator to the Hendersonville High School Soccer Booster Club for $2,500. But he returned the money when the Metropolitan Police Department informed him the Gator was stolen property and had been seized. The Hendersonville Police Department created a police report and obtained a signed statement from Elsten, explaining he did not know the Gator was stolen. Elsten was never arrested or charged in the case.

Coker argued that while the insider deal statement was inaccurate in that Elsten had not sold the Gator to the Hendersonville Parks Department, the statement was substantially true due to the close connection between the Hendersonville High School Soccer Booster Club and the Hendersonville Parks Department. This was because, Coker contended, the Booster Club held its soccer events at Drake's Creek Park, which was operated by the Hendersonville Parks Department. Nevertheless, Coker argued that even if the insider deal statement was materially false, Elsten presented no evidence to show that Coker knew the statement was false or had "a high degree of awareness" the statement was false, which was required to prove actual malice.

---

[1] The complaint alleged other defamatory statements, but they are not the subject of this appeal.

[2] Although the initial complaint referenced the Jeff Coker for Mayor campaign organization, Elsten's subsequent filings focused solely on the acts and omissions of Coker.

[3] The complaint also asserted a claim for intentional infliction of emotional distress, which is not at issue on appeal.

As for the ethics investigation, Coker contended the statement was based on the undisputed fact that the Tennessee Ethics Commission received a complaint against Elsten for campaign finance violations that pertained to alleged illegal campaign contributions from a construction company owner.

In his response to the motion for summary judgment, Elsten acknowledged that as alderman of the City of Hendersonville, he had authority over the Hendersonville Parks Department; however, he argued the insider deal statement was materially false because he had no authority over the Hendersonville High School Soccer Booster Club. Consequently, there was no "insider deal" because his position as alderman was irrelevant to the sale. Moreover, Elsten contended the implication he intentionally or knowingly sold stolen property was false.

Elsten also asserted that Coker had a high degree of awareness the insider deal statement was false. To support this assertion, Elsten cited facts in the record showing (1) Coker relied solely on rumors; (2) Coker consistently spoke favorably of Elsten in emails, and stated he had no reason to believe Elsten would be involved any anything "untoward;" (3) Coker's policy was to provide a source for the statements in the subject pamphlet but, unlike other statements, Coker did not provide a source for the insider deal statement; and (4) Coker failed to consult with anyone who had direct knowledge of the incident. Therefore, Elsten argued Coker published the statement with reckless disregard to its truth.

As for the ethics investigation, Elsten conceded someone filed a complaint against him with the Tennessee Ethics Commission for an alleged campaign finance violation. However, the alleged violation was not related to "illegal contributions" because no authoritative body declared he acted illegally. Therefore, the statement was false as a matter of law.

Following a hearing, the trial court granted Coker's motion for summary judgment ruling that Elsten "did not produce clear and convincing evidence of actual malice at the summary judgment stage." The court found Elsten lacked proof that "the source of [Coker's] knowledge was of doubtful veracity," and that "any fact known to [Coker] . . . would cause him to be highly aware of the probable falsity of his statement." This appeal followed.

## ISSUE

Although the parties raised several issues, because it is undisputed that Elsten is a public figure, the dispositive issue is whether Elsten came forward with clear and convincing proof that Coker acted with actual malice when he published the statements at

issue. *See Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn. Ct. App. 2007); *see also Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997).

## STANDARD OF REVIEW

"Summary judgments are proper in virtually any civil case that can be resolved on legal issues alone." *Tomlinson*, 969 S.W.2d at 405 (citing *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993)). "They are particularly well-suited for defamation cases because the determination concerning whether the plaintiff is a public figure is a question of law[.]" *Id.* (citing *McDowell v. Moore*, 863 S.W.2d 418, 420 (Tenn. Ct. App. 1992)). They are also well-suited for defamation cases because "the determination concerning whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice" is a question of law. *Id.* (citing *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74 (Tenn. Ct. App. 1986)).

This court reviews a trial court's decision on a motion for summary judgment de novo without a presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, this court must make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.*; *Hunter v. Brown*, 955 S.W.2d 49, 50 (Tenn. 1997). In so doing, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment does not bear the burden of proof at trial, it may satisfy its burden of production "either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264 (emphasis in original).

When a motion for summary judgment is made and supported as provided in Tenn. R. Civ. P. 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265. Instead, the nonmoving party must respond with specific facts showing that there is a genuine issue for trial. *Id.* A fact is material "if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A "genuine issue" exists if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

ANALYSIS

Generally, in a defamation action, the plaintiff must prove the defendant published a false, defamatory statement about the plaintiff with knowledge of its falsity, with reckless disregard for its truth, or with negligence in failing to ascertain its truth. *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 317 (Tenn. Ct. App. 2012) (quoting *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005)). However, the standard is different and more stringent when the plaintiff is a public figure. *Id*. This is because both the First Amendment to the United States Constitution and Article I, section 19 of the Tennessee Constitution "reflect this country's 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Lewis*, 238 S.W.3d at 288 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

In the seminal case, *New York Times Company v. Sullivan*, the U.S. Supreme Court recognized that to compel the critic of a public official "to guarantee the truth of all his factual assertions . . . on pain of libel judgments" would "lead[] to a comparable 'self-censorship.'" 376 U.S. at 279. The Court held that errors resulting from negligence are insufficient to recover on a defamation action brought by a public figure. *Id*. at 279–80. Instead, when the plaintiff is a public figure, he or she must prove by clear and convincing evidence that the defendant made the defamatory statements with knowledge the statements were false or with reckless disregard to their truth, a standard known as "actual malice." *Id*.; *Lewis*, 238 S.W.3d at 283. Reckless disregard to the truth means the defendant had a "high degree of awareness of . . . probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). In other words, reckless disregard is "the purposeful avoidance of the truth." *Id*. at 692.

Because negligence is not the standard in a public figure defamation case, a defendant's failure "to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish [actual malice]." *Lewis*, 238 S.W.3d at 301 (citing *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688). Instead, the question is not whether the defendant should have entertained serious doubts as to the truth of the publication, but whether the defendant, in fact, did entertain serious doubts. *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). That said, the defendant will not necessarily "insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732. To the contrary, such claims will not likely prove persuasive when, for example, the plaintiff has shown the story was "fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *Id*. Nor will a plaintiff likely prevail when there are "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id*.

"Public figures who desire to pursue defamation actions bear a heavy burden of proof because of our society's commitment to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Tomlinson*, 969 S.W.2d at 405 (quoting *New York Times Co.*, 376 U.S. at 270). Therefore, to recover damages, the public figure "must prove with convincing clarity that the defendant acted with actual malice." *Id.* (footnote omitted) (citing *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978); *Moore v. Bailey*, 628 S.W.2d 431, 433 (Tenn. Ct. App. 1981)).

As we explained in *Tomlinson v. Kelley*, "[t]he concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure." 969 S.W.2d at 405. Instead, "it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity." *Id.* at 406. As a consequence, "[d]etermining whether a defendant acted with reckless disregard requires the finder of fact to determine whether the defendant 'in fact entertained serious doubts as to the truth of his [or her] publication.'" *Id.* (quoting *Trigg*, 720 S.W.2d at 75).

Therefore, "**[w]hen reviewing a grant of summary judgment to a defendant in [a public figure defamation case], we must 'determine**, not whether there is material evidence in the record supporting [the plaintiff], but **whether . . . the record discloses clear and convincing evidence upon which a trier of fact could find actual malice**.'" *Lewis*, 238 S.W.3d at 283 (emphasis added) (quoting *Piper v. Mize*, No. M2002-00626-COA-R3-CV, 2003 WL 21338696, at *7 (Tenn. Ct. App. June 10, 2003)).

## I.     THE INSIDER DEAL STATEMENT

Elsten argues Coker's statements were materially false, and he published the statements with reckless disregard to their truth. With regard to the insider deal statement, Elsten contends the record reveals (1) Coker relied solely on rumors; (2) Coker held Elsten in such high esteem that he had obvious reasons to doubt the rumor; and (3) Coker had ready access to credible sources of information which would have dispelled the rumor; yet, Coker consciously chose to ignore them.

For his part, Coker argues both statements are substantially true. Alternatively, he contends if the statements are materially false, his failure to fully investigate the truth of the statements before publishing them does not constitute actual malice.

The subject pamphlet stated: "An [sic] an alderman, [Elsten] was caught in an insider deal to sell stolen property to the Hendersonville Parks Department . . . ." Elsten asserted this statement was materially false, in part, because Elsten sold the Gator to the Hendersonville High School Soccer Booster Club, which unlike the Hendersonville Parks Department, was not under the purview of the Board of Mayor and Aldermen. Therefore, it was not an "insider deal." Coker argued the statement was substantially true because

the Booster Club held its soccer events at Drake's Creek Park, which was operated by the Hendersonville Parks Department.

To determine whether the statement was materially false, we ask whether an accurate statement would produce the same effect on the mind of the reader as the inaccurate statement. 53 C.J.S. *Libel and Slander; Injurious Falsehood* § 164; *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)). It is undisputed Elsten, as a city alderman, did not have authority over the Hendersonville High School Soccer Booster Club. Therefore, referring to his sale to the Booster Club as an "insider deal" would make no sense to the average reader. Because an accurate statement would produce a different effect on the mind of the reader than the inaccurate one, the statement was materially false.

The foregoing notwithstanding, the record does not disclose clear and convincing evidence upon which a trier of fact could find actual malice. Elsten argues Coker's sole reliance on rumors to support the insider deal statement was more than merely negligent; it was reckless. We disagree.

Coker testified in his deposition that the incident, which occurred in 2009, had "been discussed in political circles for a number of years," and was "fairly common knowledge." Coker testified the rumor finally surfaced publicly during the Hendersonville mayoral race in 2012, when Scott Foster, a candidate for mayor, stated in a political mailer that Elsten sold stolen property to a school. Coker said at the time, he believed the statement in the 2012 mailer was true, for the most part; however, he was sure Mr. Foster was mistaken about the school. He said he talked to around "a half dozen" people who confirmed it was the Hendersonville Parks Department and not a school. Yet, he conceded none of those individuals had direct knowledge of the incident.

Then, in 2015, just prior to the 2016 mayoral race, Coker met Elsten at Cracker Barrel where Elsten and Coker discussed Scott Foster's 2012 mailer. Coker did not remember if Elsten specifically denied the incident[4] but only recalled that Elsten said, "Scott Foster did him dirty." Coker testified that at the time,

> the substance and facts of it I knew to be true through conversations with other folks. It seemed the detail was wrong, that it was not actually a school that was alleged in 2012, it was the parks department. I had heard that. That's what I believed at the time. Then, the Here for Hendersonville, the associated website, confirmed what I already believed to be true.

---

[4] Elsten did not remember exactly what he said when he was deposed.

"Here for Hendersonville" was an anonymous blog Coker believed was authored by Jamie Clary, a political rival of Elsten.

Elsten argues that a rumor and an anonymous blog are unreliable sources of information, and therefore, Coker had obvious reasons to question the truth of the insider deal statement. While a reasonably prudent person may question such sources, the actual malice standard does not require that Coker be a reasonably prudent person. *See Lewis*, 238 S.W.3d at 301. The question is not whether Coker ***should have entertained serious doubts*** as to the story's truth; rather, the question is whether he, ***in fact, did entertain serious doubts***. *See Harte-Hanks Commc'ns, Inc*., 491 U.S. at 688. It is undisputed the story was not a figment of Coker's imagination. It had been circulating in the community for many years, so much so Coker considered it "common knowledge." We recognize that Coker cannot "automatically insure a favorable verdict" by testifying he believed the rumor. *See St. Amant*, 390 U.S. at 732. But Elsten, in the face of Coker's testimony, must present clear and convincing evidence showing Coker did not believe it. *See id*. The problem for Elsten is that the record does not disclose such evidence.

Elsten relies on two emails Coker sent in 2012 and one he sent in 2016 wherein Coker purportedly spoke favorably of Elsten to others. In one of the emails sent in 2012, Coker said he supported Steve Brown for mayor of Hendersonville but "Tommy Elsten would also make a good choice. He has been consistently right on the issues during his time serving as BOMA and has a well thought-out vision for our future." In the other 2012 email, Coker opined that Elsten "probably has the most rock-solid base of support of any of the guys in the race."

We have determined that Elsten's reliance on the 2012 emails is unavailing because they are not probative of Coker's state of mind in 2016 when he published and disseminated the statement at issue. The most probative email is the one Coker sent in August 2016, approximately three months prior to publishing the insider deal statement. And unlike the other emails, it is scathing in its critique of Elsten. In it, Coker stated that Elsten and his campaign organization violated campaign finance law by operating rent-free out of a building owned by one of Elsten's supporters, Gary Ealey, a construction company owner. Coker wrote:

> Bottom line, both Tommy Elsten and his supporter are breaking the law. Worse, it's not just the letter of the law they're violating, it's the very spirit of it, too. The whole reason campaign finance laws exist is to prevent influence-peddling. Well, not only does Gary Ealey own a construction company, but he owns several other commercial properties in Hendersonville as well . . . . Not only that, but his son is a developer and is right now trying to get rezoned property along Center Point Road adjacent to Mansker Farms to build 400+ more homes . . . . I'm not saying Tommy would do anything untoward to help his friend and campaign contributor,

but the fact they're already conspiring together to break campaign finance laws is EXTREMELY troubling.

.   .   .

We simply can't afford to let Tommy Elsten and his cronies anywhere near City Hall. This campaign finance stuff is just the tip of the iceberg when it comes to him not being who he says he is.

Elsten contends Coker's statement, "I'm not saying Tommy would do anything untoward" shows Coker believed Elsten was incapable of unethical or criminal acts and had reason to question the truth of the insider deal statement. However, when read in context, a reasonable juror would not conclude Coker held Elsten in high esteem—quite the opposite.

Additionally, Elsten contends Coker's failure to ask Elsten directly if the rumor was true or to read the police report containing Elsten's version of events, proves Coker purposefully avoided the truth. He contends that Coker's citing a verified source for every statement about Elsten except the insider deal statement shows Coker knew the insider deal statement was false. He compares this case to *Harte-Hanks Communications, Inc. v. Connaughton*, wherein the Supreme Court determined that a newspaper defendant acted with actual malice when it failed to interview a key witness before publishing a defamatory statement about the plaintiff. 491 U.S. at 692. However, Elsten's reliance on *Harte-Hanks* is misplaced.

In that case, a candidate for judicial office, Daniel Connaughton, brought a libel action against a newspaper for publishing a defamatory story about him. *Id*. at 660. The article quoted a grand jury witness, Alice Thompson, as stating that Connaughton "offered her and her sister jobs and a trip to Florida 'in appreciation' for their help in an investigation" involving Connaughton's political rival. *Id*. At the trial on Connaughton's defamation claim, the testimony revealed that the editor of the newspaper instructed the reporters to interview all of the witnesses to the conversation between Connaughton and Thompson, most of whom were Connaughton's supporters, with the exception of Thompson's sister—the only witness likely to verify Thompson's version of events. *Id*. at 682. The U.S. Supreme Court found this deliberate omission very telling: "[W]hile denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from [Thompson's sister] would quickly put an end to the story." *Id.* The Court described the newspaper's actions as going beyond a negligent failure to conduct a full investigation. *Id*. at 692. Instead, it was "a deliberate effort to avoid the truth." *Id*. at 684–85.

Elsten argues that by failing to consult Elsten directly about the rumor and by failing to read the police report containing Elsten's version of events, Coker, like the

defendant in *Harte-Hanks*, deliberately avoided the truth. However, in *Harte-Hanks*, the plaintiff presented strong circumstantial evidence showing the newspaper intentionally avoided interviewing the one witness it knew would be truthful. *See id.* at 682. Here, upon reading the 2016 email, a reasonable juror would not conclude that Coker thought Elsten would be truthful. Consequently, Coker's failure to consult the police report or to ask Elsten directly about the rumor does not suggest Coker purposefully avoided the truth.

As the United States Supreme Court explained in *Harte-Hanks*,

[The First Amendment] must be protected with special vigilance. When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," and cannot "'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches[.] Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty.

491 U.S. at 687 (citations omitted) (footnote omitted).

Because the record does not disclose clear and convincing evidence upon which a trier of fact could find actual malice, we affirm the trial court's decision to summarily dismiss Elsten's defamation claim as it relates to the insider deal statement.

## II. THE ETHICS INVESTIGATION STATEMENT

With regard to the ethics investigation statement, the pamphlet claimed Elsten was "under investigation by the Tennessee Ethics Commission for campaign finance violations relating to illegal contributions from a construction company owner." Elsten contended this statement was materially false; however, his deposition testimony indicated otherwise:

Q. Okay. So you were called in by the Tennessee Ethics Commission to answer their questions about this allegation that there were campaign finance violations, right?

A. Yes.

Q. And those alleged campaign finance violations related to alleged illegal contributions from a construction company owner, right?

A. Yes.

Q. Was there any sort of hearing held?

A. There was.

Thus, the statement was not materially false. Further, if we were to determine that the statement was materially false because the campaign contributions were not illegal, only alleged to be illegal as Elsten maintains, Elsten failed to submit any evidence showing Coker published the statement with knowledge of its falsity or with reckless disregard to its truth.

The foregoing notwithstanding, Elsten argues Coker "avoided the truth by failing to make a reasonable investigation" to determine if Elsten's actions were, in fact, unlawful. However, as we previously stated, a defendant's failure "to investigate information . . . before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish [actual malice]." *Lewis*, 238 S.W.3d at 301 (citations omitted). Significantly, Elsten did not point to any facts in the record indicating Coker entertained serious doubts as to the truth of his statement concerning the ethics investigation.

Because the record does not contain clear and convincing evidence upon which a trier of fact could find actual malice, we affirm the trial court's decision to summarily dismiss Elsten's defamation claim as it relates to the ethics investigation statement.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Thomas J. Elsten.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 11 -