IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 16, 2016 Session


**DANIEL B. EISENSTEIN v. WTVF-TV, ET AL.**


**Appeal from the Circuit Court for Davidson County**
**No. 11C2538     Jon Kerry Blackwood, Senior Judge**

_____


**No. M2015-00422-COA-R3-CV- Filed May 3, 2016**
_____


On remand from a prior appeal, the parties engaged in discovery and the defendants then moved for summary judgment on the two remaining issues – claims of false light invasion of privacy against a television station and its employees. The trial court granted the motion, finding that the standard of actual malice was not met and awarding discretionary costs against the plaintiff. The plaintiff appealed. We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and ROBERT L. HOLLOWAY, Jr., Sp. J., joined.

Robert L. Delaney, Nashville, Tennessee, for the appellant, Daniel B. Eisenstein.

Jon D. Ross and Ronald George Harris, Nashville, Tennessee, for the appellees, WTVF-TV, News Channel 5 Network, LLC, Sandy Boonstra, and Phil Williams.


**OPINION**

This is the second appeal in this case. In *Eisenstein v. WTVF-TV*, 389 S.W.3d 313 (Tenn. Ct. App. 2012), we summarized the background of the case:

This matter arises from two news stories broadcast by Nashville television station WTVF. The first story, broadcast on July 19, 2010, questioned whether Davidson County General Sessions Judge Daniel Eisenstein was being

investigated by the Tennessee Court of the Judiciary. The second story, broadcast February 28, 2011, questioned whether Judge Eisenstein hired an unlicensed individual to act as a psychologist for the drug court program. On June 29, 2011, Judge Eisenstein filed a complaint against WTVF-TV, News Channel 5 Network, LLC, Landmark Media Enterprises, LLC, Lyn Plantinga, Station Manager for WTVF, Sandy Boonstra, News Director for WTVF, and Phil Williams, a reporter for WTVF. The complaint alleged that the defendants committed libel and false light invasion of privacy in the two news stories. The defendants responded to the complaint with a motion to dismiss.

Apparently, the need for a special judge to hear the matter caused some delay, so the defendants moved for a protective order staying discovery until their motion to dismiss was decided. Chancellor D.J. Alissandratos was appointed to hear the case. Judge Eisenstein filed an affidavit pursuant to Tenn. R. Civ. P. 56.07 requesting to complete discovery before the defendants' motion to dismiss was heard. The trial court heard all the pending motions on September 22, 2012. Because materials outside of the pleadings were submitted in support of the motion to dismiss, the court treated the motion as one for summary judgment. The trial court granted the motion for summary judgment in an order entered October 3, 2012, stating that "because [Judge Eisenstein] is a public figure, the Court must, under existing case law, grant the defendants a judgment." Judge Eisenstein has appealed to this court.

*Eisenstein,* 389 S.W.3d at 316 (footnotes omitted). We affirmed the grant of summary judgment as to the libel claims, but reversed the grant of summary judgment as to two false light claims. Specifically, as to the February 28, 2011, broadcast, we held that:

we believe that a reasonable person could find that, by leaving out the fact that Judge Eisenstein did not pursue the grant once he found that Casey was not licensed, the portion of the broadcast concerning submission of the funding request to the Department of Justice could be viewed as holding Judge Eisenstein in a false light by implying he lied to the Department of Justice. Similarly, a reasonable person could find that the portion of the broadcast stating that Judge Eisenstein "Still, . . . had nothing to say," while showing him refusing to discuss the matter with Williams on the sidewalk, held Judge Eisenstein in a false light by indicating he was uncooperative or evasive, even though the broadcast also mentioned information supplied by his lawyer. Therefore, as to these latter two claims, we reverse the grant of summary judgment.

*Id*. at 328-29. The Tennessee Supreme Court denied permission to appeal.

On remand, a new special judge was eventually found to hear the case. Discovery was taken and the defendants filed a motion for summary judgment.[1] The motion was based on the argument that, now that the facts had been fleshed out by discovery, Judge Eisenstein could not establish the essential elements of his false light claims. Specifically, the motion claimed that there were no false implications in the broadcast; the portions of the news broadcast at issue "cannot be considered as highly offensive to a reasonable person"; and, Judge Eisenstein cannot establish actual malice. The trial court ruled that the facts "do not meet the standard of actual malice," and granted summary judgment to the defendants.[2] Judge Eisenstein appealed.

### STANDARD OF REVIEW

Appellate courts "review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Thus, we examine the matter anew to decide if Tenn. R. Civ. P. 56 has been satisfied. *Id*. In *Rye*, the Tennessee Supreme Court identified the standards that govern the appellate court in our examination of a motion for summary judgment:

> when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Id*., 477 S.W.3d at 264. Tennessee Rule of Civil Procedure 56.03 requires more than conclusory statements by the moving party. The motion for summary judgment must be supported by "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." TENN. R. CIV. P. 56.03. The nonmoving party must respond to each fact listed by the movant. *Rye*, 477 S.W.3d at 265. The nonmoving party must rebut the contentions of the movant that there are no genuine issues for trial: "[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id*. Summary judgment is granted when it is shown "that there is no genuine issue as to any material fact

---

[1] The defendants' motion applied both the summary judgment standard mandated by *Hannan v. Alltel Publishing Co*., 270 S.W.3d 1, 8-9 (Tenn. 2008), and Tenn. Code Ann. § 20-16-101, which altered the standard. *Hannan* has been overruled by *Rye v. Women's Care Center of Memphis*, MPLLC, 477 S.W.3d 235, 264 (Tenn. 2015).

[2] The trial court did not rule on the other grounds put forth by the defendants.

and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04.

ANALYSIS

The February 28, 2011 Broadcast

The February 28, 2011, broadcast was as follows:

ANCHOR 1: Tonight, a News Channel 5 investigation has uncovered serious questions about whether a Nashville judge put mentally ill defendants in the care of a man who wasn't licensed to treat them.

ANCHOR 2: The judge and the man that he called an excellent psychologist insists [sic] they haven't done anything wrong. But as our chief investigative reporter, Phil Williams discovered, their answers raise even more questions.

REPORTER: General Sessions Judge Dan Eisenstein runs the Davidson County Mental Health Court, a court designed to give troubled offenders a chance to get the help they really need.

JESSICA POE: He's literally said, "I am God in this courtroom. You know, you're going to do what I say you're going to do."

REPORTER: For Jessica Poe, that meant being ordered to take psychiatric medications and working with this man. Poe says James Casey was her psychologist.

JESSICA POE: He was all about talking, talk therapy, you know, getting into the root of your issues and like why you were behaving or acting out the way you were.

REPORTER: Dr. Casey, I'm Phil Williams . . . But as our News Channel 5 investigation discovered, Casey may have his own issue.

REPORTER: You're not licensed, are you?

JAMES CASEY: No, sir.

REPORTER: Under Tennessee law, it's illegal for a person to present themselves or let others present them as a psychologist unless that person is

- 4 -

indeed licensed by the state as a psychologist. It's also illegal for them to provide counseling, psychoanalysis or psychotherapy.

DR. THOMAS: And if they're not licensed, then they're not accountable.

REPORTER: Dr. Murphy Thomas is a past president of the Tennessee Psychological Association. He says a psychologist license shows that the person has what it takes before he starts tinkering with peoples' lives.

DR. THOMAS: I've seen people who have been treated in very destructive ways. There was nothing that could be done because they were not licensed and they wouldn't qualify, and what do you do?

REPORTER: Hey, Judge, Phil Williams. I'd like to talk to you about James Casey.

EISENSTEIN: I can't discuss that with you right now.

REPORTER: Through an attorney, Judge Eisenstein claimed he never hired Casey to do the work of a psychologist.

JUDGE EISENSTEIN: See all these TV cameras here, I want you to say that one more time.

REPORTER: Yet the judge was all smiles at this ceremony last fall as Poe listed the benefits of Mental Health Court.

JESSICA POE: One is the relationship I was able to form with a psychologist for the first time in my life, Dr. Casey.

REPORTER: Afterwards, the man she called her psychologist could be seen congratulating her on a job well done.

JAMES CASEY: I don't do any psychiatric care in the Mental Health Court.

REPORTER: Why would that young lady have said you were her psychologist? Was she making it up?

JAMES CASEY: Ah, I don't know, you're going to have to refer—I don't know.

REPORTER: In fact, Casey's own resume shows that in April of 2008 he first began working as a quote "independent contracted clinician" for the court. Among his duties: "facilitate weekly group therapy."

REPORTER: (To Dr. Thomas): Group therapy is one of the things—

DR. THOMAS: Yes.

REPORTER:—you cannot do unless you're a licensed psychologist?

DR. THOMAS: That's correct.

REPORTER: Documents show that in late '08 Judge Eisenstein wanted to put Casey on staff using federal money, writing in this memo that Casey had proven himself an excellent psychologist.

REPORTER: You told the Department of Justice that he was an excellent psychologist; what gave you that idea?

JUDGE EISENSTEIN: (Did not answer.)

REPORTER: Eisenstein's lawyer says the judge later learned that Casey was not licensed, but felt he could still be useful in other roles. But more than a year later this tax return, sworn to by the judge himself, listed Casey as "staff psychologist."

REPORTER: If you knew he wasn't licensed, why would you tell the IRS that he was your staff psychologist?

Still, the judge had nothing to say.

REPORTER: How can you be treating patients and not be licensed?

JAMES CASEY: I'm working under supervision.

REPORTER: The judge's attorney says Casey did engage in what he called clinical activities under the supervision of a clinical psychiatrist. A letter from the psychiatrist says he met with Casey just one hour weekly.

DR. THOMAS: If that individual is saying, well, because I've been supervised by a psychiatrist, I can practice psychology, that's not the case.

JAMES CASEY: I never claimed to be, you know, that I was licensed.

REPORTER: But Casey did bill a sister program operated by the Davidson County Drug Court known as DC4, for "clinical services" and for a while had checks made out to Casey's Psychological Services.

JESSICA POE: Thank you, Dr. Casey. You are the backbone of this court, as far as I'm concerned.

REPORTER: While Jessica Poe says that it does not matter to her whether Casey is licensed, or not—

JESSICA POE: Dr. Casey is great at what he does. I don't care if he's not licensed with the state.

REPORTER:—experts say it should matter to Judge Eisenstein, especially when he's putting mentally ill defendants into that person's hands.

Now, our investigation discovered that when Casey first began providing counseling service, he was being represented as Dr. Casey, even though he had not yet been awarded a doctorate. He later got that degree. Still, the state requires tests, background checks and all sorts of other hoops before someone can work as a psychologist.

And, Rory, the Davidson County Drug Court which now pays him refuses to say if he's still doing therapy for its clients.

ANCHOR 2: And, Phil, he claims that he was working under supervision; does that make any difference?

REPORTER: Not really. He also claimed to be working under the supervision of a psychologist over at Meharry, but the state says he would still need a license and he just doesn't have one.

ANCHOR 2: Interesting. Phil, thanks so much for that.

The judge and Dr. Casey have sent us multiple letters insisting they've done nothing wrong, and you can see those and all our documents at

Newschannel5.com.[3] Then tell us what you think. Go to the News Channel 5 Investigates page on Facebook.

(End of Recording)

*Eisenstein*, 389 S.W.3d 324-26.[4]

## Actual Malice

The trial court granted the defendants' motion for summary judgment, ruling that the facts "do not meet the standard of actual malice."[5]  Before examining the proof, we must determine the meaning of "actual malice."

"[A]ctual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure . . . ." *West v. Media General Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001).  "[T]he term 'actual malice' refers to the publication of a statement with knowledge of falsity or with reckless disregard as to truth or falsity." *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007).  It is a subjective standard.  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). To survive the defendants' motion for summary judgment, Judge Eisenstein must show that he can prove "clearly and convincingly" that the defendants acted with actual malice.  *Lewis*, 238 S.W.3d at 300.  The defendants must be shown to have had a "'high degree of awareness of . . . probably falsity.'"  *Id.* at 301 (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 688, quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).  This is a high standard, made necessary for the protection of First Amendment rights.   Whether the evidence supports a

---

[3] There is no dispute that the January 28, 2011 letter mentioned later in this opinion was placed on the website.

[4] As we noted in our earlier opinion,

> This transcript is based on a transcript of the February 28, 2011 broadcast attached as an exhibit to the affidavit of Sandy Boonstra. Minor changes in words and punctuation have been made from listening to the DVD of the broadcast and examining the copy of the news story as posted on the NewsChannel 5 website, both of which were also attached as exhibits to the Boonstra affidavit.

*Eisenstein*, 389 S.W.3d at 324 n.9.

[5] Tennessee Rule of Civil Procedure 56.04 requires that the trial court "state the legal grounds upon which the court denies or grants the motion, which shall be included in the order reflecting the court's ruling."

finding of actual malice is a question of law. *Harte-Hanks Commc'ns*, 491 U.S. at 685.

Judge Eisenstein insists that the February 28, 2011, broadcast placed him in a false light by implying that he lied on a federal grant application and by indicating that he was uncooperative. The defendants maintain that Judge Eisenstein cannot prove actual malice by clear and convincing evidence. They say that the news story was about the qualifications of Dr. Casey – whether he was licensed to do what he was being hired by Judge Eisenstein to do. The news anchor's introduction of the story supports this view: "Tonight, a News Channel 5 investigation has uncovered serious questions about whether a Nashville judge put mentally ill defendants in the care of a man who wasn't licensed to treat them." The news report addressed Dr. Casey's activities and whether he was licensed to perform those activities. The grant application was mentioned once by Mr. Williams: "Documents show that in late '08 Judge Eisenstein wanted to put Casey on staff using federal money, writing in this memo that Casey had proven himself an excellent psychologist." The focus of that comment was on Judge Eisenstein's reference to Dr. Casey as "an excellent psychologist," when the defendants' investigation had raised questions about his licensure. Mr. Williams stated in this deposition that he believed "that Judge Eisenstein had drawn that conclusion because Mr. Casey was providing services that one would normally associate with a psychologist." Furthermore, Mr. Williams said, "that statement was entirely consistent with everything else that I had learned about what Mr. Casey had been doing. So, no, I did not mean to imply that Judge Eisenstein had, you know, lied to the Department of Justice and I never anticipated anyone would read that into it."

In addition, the defendants have put forth other legal and factual arguments to meet their burden to (1) affirmatively negate the essential element of actual malice in Judge Eisenstein's claim or (2) demonstrate that Judge Eisenstein's evidence at the summary judgment stage is insufficient to establish actual malice.[6] Thus, Judge Eisenstein must rebut the contentions of the defendants in order to survive summary judgment.

Judge Eisenstein's Evidence of Actual Malice

Judge Eisenstein maintains that we must look at the entire record and that a number of circumstances, taken together, provide convincing evidence of the defendants' actual malice.

1.  Omissions in the February 28, 2011, broadcast

Judge Eisenstein has consistently maintained that the defendants' omission from the broadcast of the fact that he did not pursue the federal grant after learning of Dr. Casey's lack

---

[6] The defendants' arguments are put forth specifically to rebut the contentions of Judge Eisenstein, so they will be addressed with Judge Eisenstein's rebuttals.

- 9 -

of licensure presented the implication to the viewers that Judge Eisenstein lied to the United States Justice Department. He contends that both Mr. Williams and Ms. Boonstra knew the true facts well before the broadcast. On January 28, 2011, Judge Eisenstein's attorney wrote to the defendants' attorney to explain the details of Dr. Casey's employment. The letter included the following statements:

> On December 12, 2008, Judge Eisenstein wrote a Sole Source Justification Request for Dr. Casey for the position of a licensed psychologist based on his understanding of Dr. Casey's status at the time he wrote the Sole Source Justification Request. . . .

> Between January 6, 2009 and January 12, 2009, this erroneous belief was corrected in Judge Eisenstein's final interview process with Dr. Casey. During the course of this discussion, Judge Eisenstein learned for the first time that Dr. Casey was not a licensed psychologist. Once Judge Eisenstein learned that Dr. Casey was not licensed, he informed Dr. Casey that the Foundation could not enter into an employment agreement with him as such. . . .

> Judge Eisenstein also realized that the basis contained in the Sole Source Justification Request for Dr. Casey's proposed compensation was incorrect and could not be relied upon by the Foundation or BJA. Judge Eisenstein was nonetheless impressed with Dr. Casey's background, work and ability. He believed that Dr. Casey could be a valuable asset to the Foundation and the joint initiative with the DC4 Program.

> So, Judge Eisenstein proposed to Dr. Casey that he and the Foundation enter into a month-to-month Independent Contractor Agreement for a position where he would coordinate/provide and assist with recovery services for participants in both the Mental Health Court and DC4 Program to implement the joint initiative. This Independent Contractor Agreement was executed on January 12, 2009. Dr. Casey and the Foundation performed this Agreement through July, 2010. The Independent Contractor Agreement referred to above is attached as Exhibit 2. No contractual agreement was ever entered into with Dr. Casey as a licensed psychologist.

> The initial request made by Judge Eisenstein for the Sole Source Justification to fund Dr. Casey's position, as a licensed psychologist was never removed from the BJA Grant Management System (GMS). Further, this Sole Source was never used for his position or any other.

> It is the Foundation's understanding that once a document has been

uploaded into the GMS, the grantee does not have the ability to remove it. Any confusion as a result of this document remaining in the GMS is certainly regrettable. However, it should be understood that the Foundation and Judge Eisenstein learned of its erroneous understanding of Dr. Casey's qualifications and acted appropriately to ensure that no action was taken upon it. . . .

Any suggestion which News Channel 5 and Mr. Phil Williams may broadcast that Judge Eisenstein and the Foundation contracted with a professional to perform as a licensed psychologist who was in fact not licensed is false. Any suggestion that public funds were expended to engage a licensed psychologist who in fact was not licensed is false.

Admittedly, the records Mr. Phil Williams News Channel 5 obtained from BJA may be misconstrued. This explanation should eliminate any confusion and my clients are happy to set forth the true facts of this matter.

After the remand and further discovery, the defendants developed the argument that some of the statements made by Judge Eisenstein in the original appeal about how Dr. Casey was paid were not accurate. In other words, the defendants argue that even if there was an implication by omission as described by Judge Eisenstein, the defendants were accidentally correct.[7] However, even if Judge Eisenstein is correct that an inference was created, we do not find that Judge Eisenstein provided clear and convincing proof that the defendants created the inference with knowledge of its falsity or with reckless disregard as to its truth or falsity.

## 2. Pre-Broadcast Knowledge of True Facts

Judge Eisenstein provided, through his attorney, quite a bit of information to the defendants. Specifically, Judge Eisenstein points to the above-quoted letter of January 28, 2011, as showing that the defendants had specific information that "Judge Eisenstein had not pursued sole source compensation for Jim Casey from the Justice Department once he learned Casey was unlicensed." A shoddy investigation, however, is not the equivalent of actual malice. *Bertrand v. Mullin*, 846 N.W.2d 884, 895 (Iowa 2014). He also maintains that the information he provided to the defendants proves that he had plenty to say, contradicting the report's assertion that "Still, the judge had nothing to say." Imprecise language, by itself, does not establish actual malice. *Forbes Inc., v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex. 2003).

---

[7] The defendants argue in their brief, "It could not be more clear that the allegedly left out 'fact' that Judge Eisenstein 'did not pursue the grant after he learned Mr. Casey was not licensed' is simply not a fact."

- 11 -

3.      Chronology Leading to and Following the June 23, 2011, Hearing

In 2009, WTVF-TV ran a series of stories by Mr. Williams about the Davidson County General Sessions Courts.  Some focused on specific judges' work habits, others on the improper dismissal of traffic citations, otherwise known as "ticket fixing."  On May 24, 2010, Mr. Williams received two parking tickets while parked in a space reserved for media by the Metro Police Department.  Apparently, he did not display his "press placard" on his car.  Although Mr. Williams maintains that he did not request any special treatment,[8] after checking into the circumstances and finding that Mr. Williams was there for official media business, Captain Rita Baker wrote a letter to the Traffic Court Clerk stating:

> In the interest of justice the MNPD is asking to intervene in the second ticket that was issued (#2691381) and ask that it be dismissed.  In order to remain consistent with prior practice the recommendation is that no action be taken on the first citation issued (#2691377) and Mr. Williams will have this matter heard in traffic court.
>
> Please consider this as a request to withdraw prosecution on parking ticket #2691381.

The police department's request came to Judge Eisenstein's attention because he was the Presiding Judge of the Davidson County General Sessions Court. After conferring with a number of persons, including other general sessions judges, Judge Eisenstein decided to hold a hearing to determine whether the department had violated policy by requesting the out-of-court dismissal of one of Mr. Williams's parking tickets.  The hearing was held June 23, 2010 as part of the "8:30 traffic docket."[9]  The matter was styled: *In re: Letter Regarding Traffic Ticket No. #2691381 Jack P. Williams.*  Mr. Williams was not asked to appear, and it should be noted that he had already paid both tickets. Testifying at the hearing were Officer Mark Patterson, who wrote the tickets; Detail Supervisor Emrick Clark, who had notified Lieutenant Lyon of the tickets; Lieutenant Lyon, who had questioned whether a second ticket was proper and took the issue to Captain Baker; Metro Attorney Ms. Tucker-Jones,[10] who

---

[8] In his deposition, Mr. Williams stated:  "My mom didn't raise no fool.  I was very aware that that was not something that I should do."

[9] In the transcript of the hearing, Judge Eisenstein states that it is the "8:30 traffic docket." Mr. Kevin Wisniewski, executive producer of the investigative team at WTVF-TV, testified that he thought the hearing occurred "between 10:00 and 11:00 A.M."

[10] Ms. Tucker-Jones did not testify as a witness, but she provided a great deal of information in her colloquies with Judge Eisenstein.

- 12 -

discussed the fact that issuing a second ticket was inconsistent with Metro's policy and told Captain Baker to write the letter; Captain Baker, who testified about the second ticket being inappropriate; and Don Aaron, who testified about telling Mr. Williams that the department would ask that the second ticket be dismissed. Much of the hearing was taken up with vigorous questioning by Judge Eisenstein about whether preferential treatment was provided to Mr. Williams and what exactly Metro's policy was about multiple tickets. While no one with the department testified that preferential treatment had been provided to Mr. Williams, Judge Eisenstein was clearly bothered by the fact that, when they determined the issuance of a second ticket was improper, the decision-makers at the department did not check to see if other persons besides Mr. Williams had received two tickets. Mr. Williams was the only person to get relief – except he actually didn't because he paid the tickets.

Mr. Williams received a call from Don Aaron telling him about the hearing and that it had commenced. Mr. Williams asked Kevin Wisniewski to attend. Mr. Wisniewski attended part of the hearing and reported back. He asked for a recording of the hearing that afternoon. Apparently, after listening to the recording, Mr. Williams believed that Judge Eisenstein's actions in the hearing were "an effort to embarrass him rather than an effort to pursue any legitimate objective."

On June 25, 2010, News Director Sandy Boonstra wrote the following letter to the Tennessee Court of the Judiciary:[11]

Honorable Justices of the Court of the Judiciary,

This is not a formal complaint, but rather a statement of concern with respect to the actions of Judge Dan Eisenstein, presiding judge of the Davidson County General Sessions Court, during a hearing he held Wednesday, June 23'd, 2010. The hearing was called without notice to hear testimony in the case of two parking tickets issued May 24th, 2010 to NewsChannel 5's Chief investigative Reporter Phil Williams. Mr. Williams notified me immediately of the tickets he received during the course of conducting station business. Without any request from Mr. Williams or anyone else at NewsChannel 5, Don Aaron with the Metro Police Department contacted Mr. Williams and said the department's internal review had concluded that it had been a violation of law and policy to issue two tickets for the same offense and that they intended to file a motion to recall the second ticket only. Regardless of this outreach, we decided to simply pay the tickets.

---

[11] The Tennessee Court of the Judiciary, at the time of the writing of this letter, was the body that investigated complaints of judicial misconduct. It has since been replaced by the Board of Judicial Conduct. *See* 2012 TENNESSEE PUBLIC ACTS, Ch. 819.

Judge Eisenstein was aware that both tickets had already been paid. Metro legal attempted to withdraw the motion to recall the second ticket, and as a result there was no case. But Judge Eisenstein insisted he wanted to have a hearing anyway. Mr. Williams was never told of the hearing so we requested the audio tape recordings. After review, it is my opinion that Judge Eisenstein was unprofessional in his statements and questioning. His remarks about Mr. Williams and NewsChannel 5 were out of line, particularly in light of the fact we were not invited to the hearing and even more so, that we paid each of the tickets. During the testimony it was evident police followed proper procedures in recalling the second ticket and that this hearing was an attack on Mr. Williams and the credibility of our news operation.

After listening to the audio recordings, it appears that Judge Eisenstein was not interested in getting to any sort of truth, but rather was there to incite public outrage alleging Mr. Williams, the reporter who did stories on "ticket fixing" was getting his own ticket fixed. The judge made it clear that he had a personal interest since he had been the subject of one of those stories. He also suggested before the public that Mr. Williams might have something to hide because he did not appear in court, even though Mr. Williams received no notice. The judge repeatedly tried to get witnesses to say that Mr. Williams was a willing participant in receiving preferential treatment and cut them off when they tried to clarify comments about Mr. Williams.

His allegations and comments were unprofessional. We would like to merely put this on the record that we do not approve of Judge Eisenstein's actions. My newsroom operates with high journalistic standards. I find it more than upsetting that the credibility of my reporter, Mr. Williams and the station as a whole would be attacked by a public figure in this manner without merit or without due process.

Again this is not a formal complaint, but I am compelled to make you aware of the actions that took place in a Tennessee judicial system courtroom. Judge Eisenstein said he would be writing an opinion on this hearing. I would sincerely hope that the judiciary process is upheld and that any opinion is based on facts and not personal bias against our news operation or Mr. Williams.

If I can be of any assistance in this matter please do not hesitant to contact me.

Sincerely,
Sandy Boonstra
News Director, NewsChannel 5

Less than a month later, on July 19, 2010, the defendants broadcast a story that questioned whether Judge Eisenstein was being investigated by the Tennessee Court of the Judiciary. In our prior decision in this matter, this Court determined that the statements in the story were accurate and that summary judgment on Judge Eisenstein's libel claim was appropriate. *Eisenstein*, 389 S.W.3d at 320-21. While we found under a false light analysis that the broadcast was susceptible to an inference that Judge Eisenstein attempted to obstruct an investigation of another judge, we determined that the fair report privilege applied and summary judgment as to the false light claim was also appropriate. *Id*. at 323-24.

It appears from Mr. Wisniewski's deposition that, on the afternoon of June 23 or on June 24, he requested information about the traffic docket, "to look at how tickets were handled on the administrative dockets." Mr. Wisniewski "was looking to see how various tickets were handled, if they were handled in accordance with what Judge Eisenstein had stated the way they were handled." Within a few days or weeks, Mr. Wisniewski resumed an inquiry that had been set aside some months earlier about the use of federal drug treatment money. Mr. Wisniewski stated that he resumed the inquiry after he read the General Sessions Court Annual Report on the website and noticed $600,000 of federal funds. It is this inquiry that eventually led to the February 28, 2011, broadcast.

Judge Eisenstein draws a conclusion of "ill will, spite, and even hatred" on the part of the defendants from this series of events. "The phrase "actual malice" is unfortunately confusing in that it has nothing to do with bad motive or ill will." *Harte-Hanks Commc'ns*, 491 U.S. at 666 n.7. We do not find any clear and convincing evidence of actual malice in these events.

### 4.      Admission

In their answer, the defendants admitted "that the Defendant Phil Williams believed that Plaintiff Eisenstein's conduct at such 'hearing' [on June 23, 2010] was an effort to embarrass him rather than an effort to pursue any legitimate objective." Judge Eisenstein maintains that this admission may be considered with the other items he mentions to demonstrate the existence of actual malice with convincing clarity. Alone, it proves nothing.

### 5.      Violation of Journalistic Professional Standards

Judge Eisenstein employed a journalism expert, Wendell L. Rawls, Jr., to testify about the defendants' February 28, 2011, broadcast and conduct. Not surprisingly, Mr. Rawls

- 15 -

testified that, in his opinion, the news story was as Judge Eisenstein has maintained in his lawsuit. He offered a number of criticisms of the story in light of journalistic standards. His criticisms may be summarized as follows:

a.  He thought the defendants, in their broadcast of February 28, 2011, should have mentioned that WTVF-TV had written to the Court of the Judiciary with "concerns" about Judge Eisenstein's conduct. Furthermore, Mr. Rawls believed that Mr. Williams was precluded "from doing further reporting on Judge Eisenstein because he [Williams] was taking it quite personally."

b.  Mr. Rawls stated that the point of the story was that Judge Eisenstein "did something wrong." "[I]t appears that you're saying he wants to use the federal funds to hire somebody who is not qualified." "[Y]ou don't take the next step. When he learned he wasn't a licensed psychologist, they never pursued the sole source justification and put him in a position doing what he was doing before, which was - - where he was not required to do anything that a licensed psychologist was required to do. And you don't say that."

c.  He also criticized the investigative process. "I don't see that they interviewed anybody at the justice department." He also criticized not interviewing the judge of the drug court, which got most of the federal money, and the people who prepared the documents used in the story.

d.  Mr. Rawls viewed the February 28, 2011, news story as not newsworthy because there was no evidence of harm or wrongdoing to any individual.

e.  Mr. Rawls also criticized the attempt to interview Judge Eisenstein on the street,[12] stating, "I think it's ambush journalism[13]. . . I just think it is ambush;

_____

[12] Judge Eisenstein, in an affidavit, had this to say about the street interview:

My counsel informed the Defendants' counsel that I was not agreeable to an on camera interview with the Defendant, Williams because I am mistrustful about the manner in which he edits or presents such interviews. Despite our efforts to fully cooperate in providing information about the subject matter of the February 28, 2011 news story and the agreement with his counsel, the Defendant, Williams apparently followed me to my lawyer's office with a camera person on February 21, 2011 (i.e. President's Day).

Following my meeting with my lawyer, I was returning to my car at the A.A. Birch Building. As I walked to the intersection of Deaderick Street and Third Avenue in Nashville, Tennessee, Mr. Williams and his camera person appeared around the corner of the Regions Center asking questions and making video.

I told the Defendant, Williams I could not talk with him. I was providing information on the proposed news story about the Mental Health Court in an agreed

- 16 -

that you are trying to embarrass somebody and to present them in a - - so that they look in a negative - - in the negative context - -." When asked what should be done if a public official is unwilling to be interviewed, Mr. Rawls suggested that there were other ways to get information and a picture other than an ambush interview.[14]

Judge Eisenstein uses these "violations" of journalistic standards as further evidence of the defendants' malice.[15] However, "[e]ven 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' does not establish actual malice." *Parsi v. Daioleslam*, 890 F.Supp.2d 77, 81 (D.D.C. 2012) (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 666).

---

fashion through counsel. Despite my statement to him, he continued to ask questions and his camera person continued to video me until I returned to the interior of Regions Center.

[13] Journalist MikeWallace helped pioneer what is known as "ambush journalism." Wallace later had "serious misgivings about the form. 'Most of the time it's an unnecessary contrivance,'" says Wallace, "and we could get the same information another way.'" Tony Schwartz, *Lessons of the 60 Minutes Case*, N.Y. MAG., June 20, 1983, 30, 34. Wallace "and the late 60 Minutes executive producer Don Hewitt 'came to the conclusion that there was more heat than light that came out of that. We weren't getting a lot of information from those so-called ambushes. So we quit . . . I have no doubt that what we started has become a plague.'" *Howard Kurtz Remembers Mike Wallace, Legendary CBS Newsman, Dead at 93*, http://www.thedailybeast.com/articles /2012/ 04/08/howard-kurtz- remembers-mike-wallace-legendary-cbs-newsman-dead-at-93.html (quoting a 2006 interview on CNN).

It has been asserted that "[a]mbush interviews provide little additional content to a story, but they provide footage that makes the subject look as if she has something to hide." Lyrissa Barnett Lidsky, *Prying, Spying, and Lying: Intrusive Newsgathering and What the Law Should Do About It*, 73 TUL. L. REV. 173, 180 (Nov. 1998).

[14] Mr. Rawls also called it "cheap-shot journalism." Judge Eisenstein, at least twice, uses the words, "I got jumped," when referring to the attempted street interview in his deposition.

[15] The defendants suggest that the testimony of journalistic standards is irrelevant and, indeed, cases exist that suggest that, because actual malice focuses on the defendant's state of mind, it "is measured neither by reasonably prudent conduct, nor an industry's professional standards." *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009)(citations omitted). Because of our ruling in this matter, we need not address the relevancy of this evidence.

## Evaluation of the Evidence

Judge Eisenstein is allowed to prove the defendants' actual malice state of mind through the use of circumstantial evidence. *Harte-Hanks Commc'ns*, 491 U.S. at 668. He attempts to do so by amassing the information mentioned above to provide what he claims is cumulative, convincing proof of actual malice. In our opinion, the totality of the evidence falls short of clearly and convincingly proving actual malice. An inference of ill will alone is not sufficient,[16] and an investigative story using a poor choice of words combined with the referenced transgressions of journalistic standards will not suffice to raise the evidence to the level of clear and convincing proof of actual malice.

## Award of Discretionary Costs

The trial court awarded the defendants discretionary costs of $20,296.00. Tennessee Rule Civil Procedure 54.04(2) gives a court the discretion to award costs to the prevailing party for, among other things, "reasonable and necessary court reporter expenses for depositions or trials" and "reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials."

We examine a trial court's discretionary decision under the criteria found in *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010):

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

The defendants submitted proof of $14,796.00 in court reporter expenses for depositions and $5,500.00 for Judge Eisenstein's expert to be deposed. Thus, a factual basis exists for the trial court's decision. The trial court found the costs to be reasonable and necessary, as required by Tenn. R. Civ. P. 54.04(2). We find that the trial court's decision is "within the range of acceptable alternative dispositions." *Id*. at 524. Therefore, we affirm the trial court's award of discretionary costs.

---

[16] The trial court stated that "an inference can be drawn that would imply ill will, spite, even hatred."

CONCLUSION

The trial court is affirmed. Costs of appeal are assessed against the appellant, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE